**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| SAMUEL WARREN<br>1284 Laskin Road<br>Virginia Beach, Virginia 23451<br><br>Plaintiff,<br><br>v.<br><br>BLOOMBERG INDUSTRY GROUP, INC.<br>1801 S Bell Street, Floor 5<br>Arlington, Virginia 22202<br><br>Serve: Corporation Service Company<br>100 Shockoe Slip, Floor 2<br>Richmond, Virginia 23219<br><br>Defendant. | ) | Civil Action No. _________ |

**COMPLAINT**

COMES NOW THE PLAINTIFF, SAMUEL WARREN, by counsel, and moves this Court for entry of judgment in his favor, and against Defendant BLOOMBERG INDUSTRY GROUP, INC., and in support of such motion alleges and avers as follows:

**NATURE OF ACTION**

1. This is a civil action alleging claims of discrimination based on a disability, failure to accommodate, and retaliation, in violation of the Americans with Disabilities Act ("ADA").

## PARTIES

2. Plaintiff Samuel Warren ("Mr. Warren") is a resident and citizen of Virginia Beach, Virginia. At all times relevant hereto, Mr. Warren was employed by Bloomberg Industry Group, Inc. in Arlington, Virginia.

3. Defendant Bloomberg Industry Group, Inc. ("Bloomberg INDG" or "Defendant") is a Delaware corporation registered and in good standing in the Commonwealth of Virginia, with its principal office in Arlington, Virginia.

4. Bloomberg INDG is an "employer" under the ADA, 42 U.S.C. § 12111(5).

## JURISDICTION AND VENUE

5. This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

6. The ADA violations all occurred in Arlington County in the Eastern District of Virginia.

7. Bloomberg INDG is present in and regularly conducts affairs and business activities in this judicial district, including from its headquarters in Arlington in the Eastern District of Virginia. Bloomberg INDG is subject to personal jurisdiction in this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2), (3), and/or (4).

8. Mr. Warren and Bloomberg INDG are residents of the Eastern District of Virginia.

9. The causes of action alleged in this action arose in the Eastern District of Virginia.

10. The unlawful employment practices committed by Defendant occurred in this judicial district, and employment records relevant to such practices are maintained and administered in this judicial district.

11. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b)(1)-(2).

## PROCEDURAL STATUS

12. Mr. Warren timely filed a Charge with the United States Equal Employment Opportunity Commission ("EEOC") on January 5, 2026.

13. On August 25, 2026, the EEOC issued a Notice of Right to Sue to Mr. Warren.

14. This action is timely filed and all procedural prerequisites have been met.

## BACKGROUND

15. Mr. Warren has a C6 incomplete spinal cord injury. He uses a manual wheelchair and experiences nerve fatigue, shoulder and lumbar strain, and bladder limitations that require intermittent catheterization. These impairments substantially limit major life activities, including walking, standing, and bladder function.

16. Mr. Warren has had a successful career in high-level roles in financial services and software sales.

17. Mr. Warren began working for Bloomberg INDG in September 2024.

18. At Mr. Warren's final interview for his position, with Bloomberg INDG's Enterprise Vice President of Sales, Bloomberg INDG failed to inform him of the ADA entrance and/or offer support, causing him to be stuck in the parking garage for an hour. His interview was forced to start one hour late as a result.

19. During this final interview, Mr. Warren openly discussed his disability and his need for accommodations, including hybrid work flexibility. Mr. Warren was assured that accommodations could be provided. Bloomberg INDG was therefore aware of Mr. Warren's disability and accommodation needs before his employment began.

20. Bloomberg INDG failed to properly engage in the accommodation process and provide necessary accommodations.

21. Mr. Warren submitted ADA forms to Bloomberg INDG when he was hired. One of the accommodations he requested was to work remotely, and other adjustments to address wheelchair travel, restroom access, and bladder management. He supplied medical documentation. The head of HR at Bloomberg INDG told Mr. Warren that the organization had never had an employee using a wheelchair before, or any employee with a physical disability. It was clear that the company was not equipped to and reluctant to provide ADA support for employees.

22. Mr. Warren went through a very uncomfortable and invasive ADA approval process to request and receive hybrid work accommodation. Bloomberg INDG intensely questioned his injury and required his doctor to join a Zoom call and provide extensive additional justification for why the hybrid work accommodation was needed due to Mr. Warren's disability. The company required that his doctor attend their ADA review meeting, during which Mr. Warren's doctor explained the necessity of the ADA accommodations.

23. When Mr. Warren submitted his ADA forms to Bloomberg INDG upon his hire, an HR representative asked me, "Why did you take this job?" clearly stating that Bloomberg INDG did not want to accommodate a person with a disability. This was after the head of corporate sales offered Mr. Warren the job and assured him that the organization could accommodate him, especially given that numerous other employees work fully remotely.

24. On or about September 20, 2024, Bloomberg approved some accommodations but declined Mr. Warren's request to work remotely four days per week. It instead permitted three

remote days per week through December 31, 2024, and two remote days per week from January 1 through March 31, 2025, subject to later review and extensions.

25. Mr. Warren's role was a sales role that could be and regularly was performed remotely. Indeed, during Mr. Warren's employment, numerous Sales and Service employees worked fully remotely, including at least one employee on Mr. Warren's own team. Importantly, none of these employees required disability-related accommodations in order to obtain remote work status. Given that these non-disabled sales employees were permitted to work remotely, there was no legitimate basis for Bloomberg INDG to deny Mr. Warren's physician-supported accommodation request.

26. Having to be in the office full-time caused damage to Mr. Warren's shoulders (due to the difficulties in pushing a wheelchair on the carpet throughout the office), as well as to his bladder. The ADA bathroom stall on his office floor was both inaccessible and often occupied by non-ADA employees. This resulted in frequent accidents, issues of incontinence, irregular bladder spasms, and continued damage to his shoulders, as the only changing area with a larger bathroom stall was six floors below Mr. Warren's office. The entry to this changing area also had an inaccessible, weighted door.

27. While Mr. Warren was offered "accommodations" afterwards, he experienced consistent physical and mental traumas from them.

28. During that accommodation review process, Mr. Warren's physician explained the medical necessity of hybrid work due to the effects of Mr. Warren's spinal cord injury, including bladder-management issues, shoulder strain, lumbar spine complications, and mobility-related limitations. Despite this knowledge, Bloomberg INDG implemented a phased return-to-office structure that required increasing in-office attendance even though the company was aware

that prolonged in-office attendance was causing ongoing physical harm and accessibility complications. That was not a reasonable accommodation.

29. Bloomberg INDG mandated a phased ADA hybrid approval – two days per week in the office during Q1, three days per week in the office in Q2, and then back to full time in the office in Q3. The company did not acknowledge the hardships Mr. Warren and his doctor had brought up regarding the pain and damage to his shoulder and bladder, and did not acknowledge his need for ADA access at company events. There was no justification for requiring Mr. Warren to work in the office. Again, numerous other employees work fully remotely. Moreover, Mr. Warren was a salesperson. There was nothing about his job that required him to be in the office.

30. Bloomberg's phased hybrid work arrangement accommodation did not effectively address the disability-related limitations identified by Mr. Warren's physician, which included inaccessible or consistently occupied ADA restroom access, physical strain from wheelchair travel in the carpeted office environment, and weighted locker room doors and accessibility limitations.

31. Mr. Warren communicated concerns regarding the effectiveness of his accommodations. Bloomberg INDG was already aware of the continuing issues because those issues formed the basis of the accommodation request itself and were repeatedly documented through the accommodation process and physician communications.

32. Despite the lack of accommodations, Mr. Warren performed well at his job, and was promoted in April 2025.

33. Before Q3 of 2025, Mr. Warren submitted a new ADA request to remain at a hybrid schedule of three days per week in the office for the rest of 2025. Bloomberg INDG denied his request for this accommodation. There was no justification for failing to provide the

accommodation. Mr. Warren threatened to sue the organization for disability discrimination, and then Bloomberg INDG accepted the request for accommodation.

34. Accessibility barriers continued throughout Mr. Warren's employment, including inaccessible restroom conditions, inaccessible company events, inaccessible parking situations, inaccessible entryways, and failures to provide requested assistance. Despite repeated requests by Mr. Warren for Bloomberg INDG to fix these issues, Bloomberg INDG simply ignored Mr. Warren's reasonable requests.

35. Bloomberg INDG failed to provide Mr. Warren with required ADA-related support, including at three mandatory company off-site events.

36. In 2024, Bloomberg INDG held an awards and sales and service kick-off event, which was a mandatory company event. The company did not provide Mr. Warren with accessible parking at the event, so he was forced to park in a parking garage over half a mile away from the venue, push his wheelchair to the event without help, and, once inside, there was no accessible bathroom available and no directions on accessibility.

37. On another occasion, the company hosted a sales workshop at a neighboring hotel. This hotel did not contain an accessible bathroom. As a result, Mr. Warren had an accident, had to use the restroom in the hotel lobby trash can, and had to leave early to change his clothes.

38. On September 18, 2025, Bloomberg INDG held an offsite sales and service pep rally. Mr. Warren had to stay later at the office to meet with customers and did not take the company shuttle to this event. He had been informed that parking was available, and that if there were any accessibility challenges, support would be available. However, upon his arrival at the event, there was no accessible parking, the entrance to the pep rally was on a hill, and no help

was provided, despite Mr. Warren calling his supervisor and waiting across the street from the event (on a slope) for over half an hour. He also called the company's events team and did not receive any answer or support. Mr. Warren then left the event, paid for his own parking, and received no contact from Bloomberg INDG for another hour regarding his requests for help with accessibility.

39. Bloomberg INDG's management was aware of these accessibility failures. His manager and director directly acknowledged the problems, and a meeting was specifically scheduled to discuss the accessibility issues and identify methods for providing assistance. Bloomberg INDG's events team and HR department were also informed of the accessibility failures and acknowledged the concerns. But they continued to fail to accommodate Mr. Warren's needs.

40. On December 1, 2025, Mr. Warren was informed that he was being terminated from Bloomberg INDG. The reasoning provided to him was that he badged another employee into the accessible elevator station on November 20, 2025. In fact, Mr. Warren had pushed his wheelchair up the ramp to the only ADA-accessible elevator in the building, scanned his badge, and pushed the button to open the door. The door then automatically opened and the other employee (who did not have ADA access) entered the elevator with Mr. Warren.

41. Mr. Warren used the ADA access route and automatic ADA door functionality, solely for his own access to the ADA-accessible elevator area. Ashley Phillips ("Mr. Phillips"), the other employee in the incident, appeared to badge himself in as well. Mr. Warren did not intentionally grant access to another employee, nor did he possess the authority to control whether another employee entered once the door opened. The company should have video footage of this incident.

42. Bloomberg INDG claimed that Mr. Warren "badged in" this other employee, Mr. Phillips. Bloomberg INDG determined that both Mr. Phillips and Mr. Warren violated company policy arising from the December 2025 incident. The other employee involved, who is not disabled, was not terminated. Bloomberg INDG only terminated Mr. Warren, who is disabled and had repeatedly requested accommodations, while imposing lesser discipline on Mr. Phillips – the non-disabled employee.

43. Bloomberg INDG applied its policies inconsistently. Earlier, in April 2025, Mr. Warren lost his ID badge. One of his teammates, Connor Cunningham ("Mr. Cunningham"), assisted him into the building. Mr. Warren was unaware of any rules against this, but Bloomberg INDG security contacted both him and his teammate to inform them of the badging policies, stating that each employee must always badge in, and in the event of a missing badge, the employee must contact security at the front desk to be allowed in to receive a new badge and deactivate the old badge. Mr. Cunningham and Mr. Warren both received a warning in this instance, but Mr. Cunningham was not terminated.

44. In addition, employees routinely entered and exited the building during lunch periods and other times without strict enforcement of badge procedures. Mr. Warren did not observe employees being terminated for those incidents. The only difference between Mr. Warren, who was terminated for a badge-related incident, and the other employees who behaved similarly, is that he is disabled, and had repeatedly requested accommodations.

45. In both situations, the other employee involved (neither of whom was disabled), including the teammate who deliberately badged Mr. Warren into the building in April 2025, was not terminated, despite performing the same action that was used as the reason for Mr. Warren's termination. In contrast, Mr. Warren was terminated for the actions of another employee in

entering the ADA elevator in December 2025. He was treated differently than his coworkers who were not disabled.

46. At the time of Mr. Warren's termination, he was performing very well. He had been promoted in April 2025 and was on track to exceed his Q4 quota, with an anticipated 100%-120% result.

47. Bloomberg INDG discriminated against Mr. Warren as a disabled employee and retaliated against him for seeking accommodations and threatening to sue.

**COUNT ONE**
**DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(against Bloomberg INDG)**

48. The foregoing allegations are incorporated as if realleged herein.

49. Mr. Warren was a qualified individual with a disability, within the meaning of 42 U.S.C. § 12102(1) and 42 U.S.C. § 12111(8) (he is a recovering quadriplegic with a spinal cord injury). With reasonable accommodation in the form of a hybrid working arrangement, Mr. Warren could continue to perform the essential functions of his position.

50. Bloomberg INDG knew of his disability and his need for accommodation. He could perform the essential functions of his sales position with reasonable accommodation and was performing those functions before discharge.

51. Bloomberg INDG terminated Mr. Warren because of his disability and disability-related needs, in violation of 42 U.S.C. § 12112(a).

52. Defendant engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Warren.

53. As a direct and proximate result of Defendant's actions, Mr. Warren has suffered and continues to suffer injury, including loss of income, loss of employee benefits, lost career

and business opportunities, embarrassment, humiliation, emotional distress, inconvenience, time, frustration, and other pecuniary damages.

54. Due to the conscious disregard for Mr. Warren's federally protected rights, and the severity of Defendant's conduct, Mr. Warren is also entitled to punitive damages.

**COUNT TWO**
**FAILURE TO ACCOMMODATE IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(against Bloomberg INDG)**

55. The foregoing allegations are incorporated as if realleged herein.

56. Mr. Warren was a qualified individual with a disability, within the meaning of 42 U.S.C. § 12102(1) and 42 U.S.C. § 12111(8) (he is a recovering quadriplegic with a spinal cord injury).

57. With reasonable accommodation in the form of a hybrid working arrangement, Mr. Warren could continue to perform the essential functions of his position.

58. Mr. Warren requested reasonable accommodations, including a hybrid work arrangement.

59. Defendant failed to provide reasonable accommodations, in violation of 42 U.S.C. § 12112(a). Mr. Warren provided explanations directly from his doctor that described his disabilities and why the accommodations sought were necessary for Mr. Warren. The requested accommodations were reasonable and would not have imposed an undue hardship. Instead, Defendant failed to provide reasonable accommodations.

60. Defendant engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Warren.

61. As a direct and proximate result of Defendant's actions, Mr. Warren has suffered and continues to suffer injury, including loss of income, loss of employee benefits, lost career

and business opportunities, embarrassment, humiliation, emotional distress, inconvenience, time, frustration, and other pecuniary damages.

62. Due to the conscious disregard for Mr. Warren's federally protected rights, and the severity of Defendant's conduct, Mr. Warren is also entitled to punitive damages.

**COUNT THREE**
**RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**(against Bloomberg INDG)**

63. The foregoing allegations are incorporated as if realleged herein.

64. Mr. Warren engaged in protected activity by requesting reasonable accommodations, objecting to the denial and inadequacy of accommodations, stating that he would pursue legal action for disability discrimination, and raising accessibility concerns with Bloomberg INDG personnel.

65. 3Bloomberg knew of that activity and thereafter terminated Mr. Warren's employment. The sequence of renewed accommodation requests, objections, accessibility complaints, and termination supports an inference that his protected activity was a but-for cause of the discharge, in violation of 42 U.S.C. § 12203(a).

66. Because he requested reasonable accommodations and opposed unlawful disability discrimination, Defendant retaliated against Mr. Warren, in violation of 42 U.S.C. § 12203. Defendant retaliated against Mr. Warren for requesting reasonable accommodations for his disability and complaining of discrimination based on his disability.

67. Defendant engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Warren.

68. As a direct and proximate result of Defendant's actions, Mr. Warren has suffered and continues to suffer injury, including loss of income, loss of employee benefits, and lost career and business opportunities, time, frustration, and other pecuniary damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SAMUEL WARREN requests that this Court enter judgment in his favor and against Defendant BLOOMBERG INDUSTRY GROUP, INC., on the above Counts as follows:

a) Award judgment in Mr. Warren's favor and against the Defendant in an amount to be determined at trial plus all pre- and post-judgment interest and consequential damages allowed by law; and in addition

b) Award Mr. Warren punitive damages as to Counts 1 and 2; and in addition

c) Award Mr. Warren attorneys' fees and costs, as permitted by law; and in addition

d) Award Mr. Warren all allowable costs and expenses he incurred in connection with this litigation, including the costs of experts; and in addition

e) Award Mr. Warren such other and further relief as may be appropriate in this case.

**JURY DEMAND**

**PLAINTIFF SAMUEL WARREN DEMANDS A TRIAL BY JURY ON THE COUNTS ABOVE.**

October 6, 2026

Respectfully submitted,

Adam S. Nadelhaft, VSB 91717
CHARLSON BREDEHOFT
COHEN BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
anadelhaft@cbcblaw.com
*Counsel for Plaintiff, Samuel Warren*